[No. 15899. *En Banc.* September 13, 1920.]

John W. Langdon *et al., Appellants,* v. The City of Walla Walla *et al., Respondents.*[1]

Eminent Domain (8)—By Cities—Powers—Property in Other State—Water Supply—Statutes. Under Rem. Code, § 7612 and § 8005 granting cities power to acquire waterworks within or without the corporate limits, the city of Walla Walla has power to acquire and own property situated in the state of Oregon, upon consent of that state, for the purpose of making extensions and betterments to its waterworks system; and the exercise of such power is not the assumption of extra-territorial jurisdiction over property situated in another state (Main, Mitchell, Mackintosh, and Bridges, JJ., dissent).

Same (8, 11)—Powers of City—Property in Other State—Statutes—Validity. Laws of Oregon, ch. 182, p. 256, enacted February 23, 1909, granting to municipal corporations of any state adjoining the state of Oregon power to purchase or condemn lands within the state of Oregon for the purpose of obtaining a water supply, which was followed in all particulars by the enactment by this state on the following day of an act granting reciprocal powers to the cities of the state of Oregon, is not unconstitutional in that it permits the right to condemn property of that state for a public use for the benefit of the people of another state, but will be held a valid exercise of the state's power of eminent domain to further the public interests of a sister state, in return for reciprocal privileges to the cities of Oregon (Main, Mitchell, Mackintosh, and Bridges, JJ., dissent).

Municipal Corporations (525)—Public Utilities—Bonds—Sale at Discount—Statutes. In an action to enjoin the issuance and sale of municipal bonds for a public improvement, the mere allegation in the complaint that the city authorities are threatening to sell "a part only of said bonds at par, and a part thereof at 95 cents on the dollar," in violation of a provision of the ordinance that "none of said bonds shall be sold or issued . . . at less than par value and accrued interest," does not warrant the court in interfering; since it will be presumed that the city authorities are not contemplating selling any of the bonds at such a discount below par that the total amount of such discount and interest will result in paying more than the maximum rate allowed by the statutes and ordinance.

[1]Reported in 193 Pac. 1.

SAME (523)—BONDS—ISSUANCE—SUBMISSION TO VOTERS—RATIFI-
CATION OF PLAN. An election submitting to the voters of a city a
proposed improvement and the issuance of bonds therefor, conclud-
ing with the· words, "and shall the ordinance be ratified" is not in-
valid as amounting to the ratification of the ordinance rather than
a ratification of the proposition submitted, since the manifest in-
tent expressed by the ordinance and ballot was that the ordinance
should be deemed in full force and effect, in so far as it provided
for the submission of the proposition.

SAME (524)—SUBMISSION TO VOTERS—NOTICE OF ELECTION—PUBLI-
CATION. Rem. Code, § 7670-22, providing that none but emergent
ordinances shall go into effect before thirty days from the time of
final passage, and granting the right of referendum during such
period, does not prevent the going into effect, upon its passage and
publication, of an ordinance submitting to the voters a proposition
of making betterments and extensions to the city's water works
system, thereby, in effect, providing within itself for a referendum;
hence the publication of the election notice less than thirty days
following the passage of the ordinance was not premature.

SAME (124)—SUBMISSION TO VOTERS—PLAN OR SYSTEM ADOPTED.
An ordinance sufficiently complies with Rem. Code, § 8006, in sub-
mitting to the voters the plan or system proposed for a public im-
provement, where it specifies the same in such general terms as
will fairly inform the voters of the general nature and extent of
the proposed improvement.

SAME (523) — BONDS — SUBMISSION TO VOTERS — SEPARATE PUR-
POSES. An election submitting to the voters the proposition of mak-
ing betterments and extensions to the city's water works system
which includes the construction of a large reservoir in addition
to the extensions, additions, pipe lines, etc., is not invalid as sub-
mitting other than a single proposition to the voters, since the
things proposed to be done all relate to the improvement of the
system as a whole.

SAME (486, 519)—BONDS—LIMITATION OF INDEBTEDNESS—CONSTI-
TUTIONAL PROVISIONS. The issuance of bonds in the sum of $500,-
000, for the making of extensions and betterments to a city's water
works system does not increase the city's total indebtedness be-
yond the ten per cent of the taxable property in such city, as al-
lowed by Const., art. 8, § 6, for all city purposes, where the assessed
valuation of the taxable property within the city is $9,982,955, and
its present indebtedness amounts to only $390,457.

SAME. Such $500,000 indebtedness is not limited to the five per
cent limitation of indebtedness allowed for supplying the city "with
water, artificial light and sewers," but is valid if the total indebted-

ness of the city is not increased thereby to more than ten per cent of the taxable property, as provided by Const., art. 8, § 6, for all city purposes.

SAME. Under Const., art. 8, § 6, allowing a city to become indebted in an amount not exceeding five per cent of the taxable property in such city, for the purpose of supplying the city "with water, artificial light and sewers," a city may exhaust such debt-incurring power in supplying the city with water alone; since the language enumerating the purposes will be regarded as reading in the disjunctive, as though it were "water, artificial light *or* sewers."

Appeal from a judgment of the superior court for Walla Walla county, Mills, J., entered April 23, 1920, in favor of the defendants, in an action for an injunction, tried to the court. Affirmed.

*Evans & Watson,* for appellants.

*H. B. Noland,* for respondents.

PARKER, J.—The plaintiffs seek an injunction preventing the city of Walla Walla and its officers from making certain proposed additions, betterments and extensions to its existing water works system and issuing and disposing of general indebtedness bonds of the city to pay the cost thereof. A hearing upon the merits in the superior court for Walla Walla county resulted in a judgment denying to the plaintiffs the relief prayed for, from which they have appealed to this court.

Walla Walla is a city of the second class under the laws of this state and has a commission form of government. It is situated about five miles north of the southern boundary of this state, which is also the northern boundary of the state of Oregon. Its present water supply comes from Mill creek, the source of which is east of the city, in this state; from whence it flows southerly across the state line into Oregon, thence for a distance of some four miles southerly, westerly

and northwesterly through Umatilla county of that state, to and across the state line back into this state, and thence in a northwesterly direction to and through the city of Walla Walla. The city already possesses some property rights enjoyed by it in the maintenance of its present water system, situated upon Mill creek, in Oregon. It seems to be one of the conditions of our problem, and we shall assume, for argument's sake, as we proceed, that the proposed additions, betterments and extensions of the city's water works system are such that, in order to successfully make them, it will be necessary for the city to acquire additional property rights upon and adjacent to Mill creek in Oregon, by the exercise of the eminent domain power of that state; and if the city has not the power to exercise the eminent domain power of that state, the betterments and extensions to its water works system as proposed cannot be made and the city and its officers should be enjoined from issuing or disposing of the bonds here in question to that end.

On November 11, 1919, the city commission, acting to pay the cost thereof, to the amount of $500,000, or the acquisition of public utilities and the making of additions, betterments and extensions thereto, Rem. Code, § 8005 et seq., passed an ordinance providing for the submission to the voters of the city the proposition of making additions, and betterments and extensions to its water works system, and the issuance and disposition of the city's general indebtedness bonds to pay the cost thereof, to the amount of $500,000, or so much thereof as may be necessary for that purpose. The proposition as set forth in the ordinance is, in substance, that there shall be constructed a 24,000,000 gallon concrete reservoir, specifying its approximate location, which shall be connected with the pipe lines

of the city's distributing system; that a new diversion dam and intake be constructed on Mill creek, within the Wenaha National Forest Reserve in Umatilla county, Oregon, to be connected by pipe lines with the city's existing system; that the city acquire title to, or permanent control over, such lands in Umatilla county, Oregon, as may be necessary to make the proposed additions, betterments and extensions, and to preserve the purity of the water to be used; that

"The city of Walla Walla, either by purchase or condemnation, shall acquire in the manner provided by law, all necessary lands, rights of way, waters, water rights, easements, privileges and property necessary for the construction, convenient use, maintenance and operation of the additions, betterments and extensions herein mentioned, and shall construct, own, control, operate and maintain said additions, betterments and extensions as a part of its municipally owned water works system";

and that the costs of the proposed additions, betterments and extensions, including the acquisition and control of property necessary therefor, all of which is declared to be of an estimated cost of $500,000, shall be paid for by the issuance and disposition of the city's general indebtedness bonds in that sum, or so much thereof as may be necessary; specifying the times within which the several specified classes of bonds shall mature, providing for such levying of taxes each year as may be necessary to pay the principal and interest of the indebtedness so evidenced, and pledging the faith and resources of the city to the payment of the bonds and interest thereon as a general indebtedness of the city. An election was accordingly held, after due notice thereof, submitting the proposition to the voters of the city, which resulted in its adoption by more than three-fifths of the qualified voters of the city voting at the election, as provided

by § 8006, Rem. Code. Other facts will be noticed as may become necessary in our discussion of the several questions presented.

The most elaborately argued, and evidently regarded by counsel for appellants as the soundest ground of contention made by them, is stated in their brief as follows:

"The trial court erred in not holding said ordinance and all proceedings thereunder invalid for the reason that the city is without any right, power or authority to purchase or acquire by eminent domain any property or property rights, or to expend money in, or become indebted for, the construction or maintenance of the proposed extension of its water works system in Umatilla county, Oregon, or within the Wenaha National Forest Reserve."

We first inquire, Has the city of Walla Walla the power, in so far as its own organic law is concerned, to acquire property of the nature and for the purpose here in question which is situated in the state of Oregon—that is, do the laws of this state grant to the city the privilege of acquiring such property in another state? In the enumeration of powers of cities of the second class, to which class Walla Walla belongs, we read in § 7612, Rem. Code, as follows:

"44. Waterworks: To provide for the erection, purchase or otherwise acquiring of waterworks *within or without the corporate limits of the city* to supply such city and its inhabitants with water, . . ."

And in § 8005, Rem. Code, the first section of the act relating to the acquiring of public utilities by cities, under which the city is proceeding, we read:

"Any incorporated city or town within the state be, and hereby is, authorized to construct, condemn and purchase; purchase, acquire, add to, maintain, conduct and operate waterworks, *within or without its limits,* . . ."

In so far as this constitutes authority for the city acquiring and owning property of the nature here in question outside of the city's corporate limits, it manifestly is authority for the city acquiring and owning property so situated, in its proprietary, and not in its governmental, capacity; that is, authority to acquire and own such property just as any corporation, other than municipal, could exercise ownership over public utility property. We find nothing in the organic law of our cities suggesting that their governmental authority shall extend beyond their corporate limits. Now, since a city's ownership and dominion over such property is of this nature, and the city is unqualifiedly authorized to acquire such property *"without"* as well as "within" its corporate limits, we are quite unable to see that the power of acquiring and owning such property is limited to property within our own state. The suggestion that to allow a city of this state to acquire property of the nature here in question in another state would, in effect, be an assumption of extra-territorial jurisdiction, we think, is wholly without force, in view of the fact that the city's ownership of such property situated outside its own territorial limits, whether within or without this state, is only the ownership and control over such property in the city's proprietary capacity. Such ownership does not, to our minds, suggest an assumption of extra-territorial governmental jurisdiction, either on the part of the state of Washington or of its cities, over property situated in another state. If the laws of Oregon permit the city of Walla Walla to acquire and own within that state property of the nature and for the use here in question, which, as we think, will presently appear, though that is apart from this particular inquiry, manifestly we must presume that the courts of Oregon

will protect the property rights the city so permissively acquires in that state, the same as they will protect the property rights of any other similar ownership of property therein, and that, should such protection be refused by the Oregon courts, the courts of the United States will afford such protection. The state of Oregon may, of course, if it so choose, withhold from the cities of this state the right to acquire property in that state, just as it may withhold such right from any other foreign corporation; but that does not argue that this state has not given to its cities such power of acquisition and ownership of property as will enable them to acquire property in Oregon by consent of that state. This, we think, is as far as we need go in our inquiry touching the power of the city of Walla Walla under its organic law; that is, under the laws of this state which brought the city into being and gave to it the powers specified in the statutes above quoted from. We conclude, then, that the city of Walla Walla does possess, in its proprietary capacity, the power to acquire and own in the state of Oregon, so far as it may be necessary for it to acquire such power from the state of Washington. Whether or not, and to what extent, the city may be able to exercise such power in the state of Oregon is, of course, a question to be decided under the laws and constitution of that state. There has come to our notice but one decision which we regard as calling for particular notice, as tending to show the law to be otherwise. That is the decision of the Wisconsin court in *Becker v. LaCrosse,* 99 Wis. 414, 75 N. W. 84, 40 L. R. A. 829. The city of LaCrosse, in the state of Wisconsin, on the east bank of the Mississippi river, was authorized by the legislature of that state to construct a bridge across that river to the Minnesota shore. The

city not only constructed the bridge, but constructed a highway, two and one-half miles long, beyond the end of the bridge in Minnesota. This seems to have been done by consent of the state of Minnesota; but manifestly without the consent, express or implied, of the state of Wisconsin, since it does not appear that the city could have gone outside its limits and maintained a highway even in Wisconsin. In a suit against the city by one injured as the result of a defect in the highway so maintained by it in Minnesota, the Wisconsin court held that recovery could not be had because the state of Wisconsin had not granted to the city the power to construct and maintain such highway in Minnesota, and that in so doing the city was wholly without authority, so the city authorities could not render it liable for any act committed in the construction or maintenance of the highway in Minnesota. We think that is not this situation.

We next inquire, Has the city of Walla Walla the right and power, under the laws of Oregon, to acquire by purchase, and also by condemnation, in the exercise of the power of eminent domain of that state, the property rights here in question which the city proposes to acquire in Umatilla county, in that state, outside of the Wenaha National Forest Reserve? We pass to the question of the city's right to acquire such property by condemnation, since, as a matter of course, if the city can acquire such property by condemnation, under the laws of that state, it can do so by purchase. On February 23, 1909, there was enacted by the Legislative Assembly of the state of Oregon, a law reading as follows:

"Section 1. That any municipal corporation of any state adjoining the State of Oregon may acquire title to any land or water right within the State of Oregon, by purchase or condemnation, which lies within any

watershed from which said municipal (corporation) obtains or ·desires to obtain its water supply.

"Section 2. That any person who shall place or cause to be placed within any watershed from which any city or municipal corporation of any adjoining state obtains its water supply, any substance which either by itself or in connection with other matter will corrupt, pollute or impair the quality of said water supply, or the owner of any dead animal who shall knowingly leave or cause to be left the carcass or any portion thereof within any such watershed in such condition as to in any way corrupt or pollute such. water supply, shall be deemed guilty of misdemeanor and upon conviction shall be punished by fine in any sum not exceeding five hundred dollars." Laws of Oregon, Ch. 182, p. 256.

On the following day, February 24, 1909, there was enacted by the legislature of the state of Washington, a law in exactly the same language, excepting that the words "State of Washington" appear in the first section thereof, as the words "State of Oregon" appear in the first section of the Oregon law. That the city of Walla Walla possesses power to acquire property of the nature and for the use here in question, situated in this state, by the exercise of its right of eminent domain, is conceded; so the express language of the law of Oregon, above quoted, renders it plain that nothing stands in the way of the city of Walla Walla acquiring property as contemplated in Oregon, by the exercise of the power of eminent domain of that state, except it be that the Oregon law is in violation of some provision of the constitution of that state. So far as we are advised, the courts of that state have never been called upon to determine the question of the constitutionality of that law, and we are therefore placed in the position of being called upon to determine that question without the aid of any expression of opinion

thereon from the courts of Oregon. We cannot escape this delicate task, because if the city of Walla Walla cannot exercise the power of eminent domain in that state which its law in terms grants to our cities, the city of Walla Walla cannot lawfully proceed in the making of the proposed additions, betterments, and extensions to its water works system. We shall assume that the question of public use is a judicial question in Oregon, as it is in our state, and that such question has been and will be decided by the courts of that state guided by the same considerations as control us; and we shall, therefore, be governed in our conclusions as we would be were this a case of an Oregon city seeking in this state what Walla Walla is seeking in Oregon.

It needs no argument to demonstrate that the purpose for which this property is sought to be acquired is, speaking generally, a public use. But counsel contend, and strenuously argue, that the public use which is necessary to support the exercise of the right of eminent domain in the acquisition of this property is a public use for the benefit of the people of Oregon, and that, since the acquisition of the property here in question lying within that state is only for the purpose of enabling the city to take and convey water from that state into this state for use wholly within this state, it is not such a use as will support the exercise by the city of Walla Walla of the eminent domain power of Oregon. Many general expressions may be found in the decisions of the courts of this country which seem to lend support to this contention. For instance, in *Kohl v. United States,* 91 U. S. 367, Justice Strong said:

"The proper view of the law of eminent domain seems to be, that it is a right belonging to a sovereignty to take private property for its own public uses, and

not for those of another. Beyond that, there exists no necessity, which alone is the foundation of the right.''

This language is used, however, only in an argumentative way, in the consideration of a controversy in which there was not involved the question of the power of a state, by express legislative enactment, to exercise or authorize the exercising of its power of eminent domain in the acquisition or damaging of property for a public use primarily in a sister state. We think that expressions of this import made in the decisions of the courts are all to be found in cases wherein there was not involved the power of a state, by express legislative enactment, to use or authorize the use of its eminent domain power for a public use in another state. The decision in *Tromley v. Humphrey*, 23 Mich. 471, seems to come nearest to the situation here involved as lending support to the contentions made in appellants' behalf. The legislature of that state passed an act purporting to authorize the exercise of the eminent domain power of that state in its own courts to acquire a site for a lighthouse, and when so acquired to convey the same to the United States. In the court's opinion, observations are made of the same general import as above quoted from the *Kohl* decision. It was held that the state's power of eminent domain could not be so exercised, because it was, in effect, the exercising of the power in the acquisition of the property for a public use, which was not a use for the people of Michigan, but for the United States. That decision, however, can hardly be regarded as authority here as to the exercising of a state's power of eminent domain for a Federal use, in view of the early decision of this court in *Lancey v. King County*, 15 Wash. 9, 45 Pac. 645, 34 L. R. A.

817, wherein this court sanctioned the exercise of the state's power of eminent domain by King county in acquiring the necessary property rights to render possible the construction of the Lake Washington canal.

In *Grover Irrigation etc. Co. v. Lovella Ditch etc. Co.*, 21 Wyo. 204, 131 Pac. 43, is to be found what appears to us as one of the most exhaustive and learned discussions to be found in the books touching the exercise of the power of eminent domain in the acquisition of property rights in one state primarily for public use in another state. That case involved the attempted condemnation of a small tract of land for a headgate and intake of water a short distance north of the southern boundary of Wyoming, which is also the north boundary of Colorado, for irrigation use in Colorado. It was held, we think correctly, that the right of eminent domain of the state of Wyoming could not be exercised by the corporation seeking to thus exercise it, because there was no law of Wyoming authorizing the exercise of the state's right of eminent domain to promote a public use beyond the state's territorial limits. Near the conclusion of his exhaustive opinion, Justice Potter, speaking for the court, uses language which we understand as plainly indicating that the court refrains from deciding what the legislative power of the state may be touching the granting of the exercise of the state's power of eminent domain in the acquisition of property within the state for a public use in a sister state. We might notice many other decisions of the courts wherein can be found general expressions seeming to lend support to the contention of counsel for appellants. We think, however, that they will all be found to come no nearer a solution of our present problem than those already noticed.

We now notice two decisions of state courts of emi-
nence, which are so nearly parallel in their facts with
the facts of this controversy that we think they are
all but conclusive in the support they lend to the con-
tentions here made in the city's behalf. In *In re
Townsend,* 39 N. Y. (App. Div.) 171, the court of ap-
peals of that state had under consideration the ques-
tion of the exercise of the power of eminent domain
of that state by a New Jersey canal company for the
purpose of acquiring property rights in New York to
aid in the maintenance of the company's canal, the
whole of which was within the state of New Jersey.
The eminent domain power of New York was sought
to be exercised in pursuance of a statute of that state
expressly authorizing the canal company to thereby
acquire the necessary property rights in New York.
The course of the canal ran from the Delaware river
easterly across the northern part of New Jersey to
tide water on the Passaic river, and constituted, with
the waters of the Passaic river, a water highway across
New Jersey to a point opposite the city of New York.
The canal passed near the southerly end of a lake
called "Long Pond," which lies partly in New York
and partly in New Jersey. It was sought by the canal
company to dam the southerly end of the lake so as
to raise the water several feet, creating a reservoir
to aid in the maintenance of the canal. This would
result in the overflowing of private property along the
northerly shores of the lake in the state of New York;
and it was to acquire the right to so damage that prop-
erty that eminent domain proceedings were prosecuted
by the canal company in the courts of the state of New
York, as it was expressly authorized so to do by the
New York statute. The argument was made that such
taking and damaging of property in New York did not

constitute the taking or damaging of such property for a public use of the people of New York, and therefore there was no warrant for the exercise of the power of eminent domain of the state of New York. In disposing of the case, Judge Woodruff, speaking for the court of appeals, said:

"If any question, discussed on this appeal, relating to the power of the legislature to authorize the respondents to take lands in this State for their reservoir, remains, it is whether this court can say that taking lands along the shore of Long pond, in the sense in which it was authorized by the act, viz., by flooding it in making such pond a reservoir for supplying the respondent's canal, is taking private property for a public use.

"The respondents' canal runs from the Delaware river, in New Jersey, to the Hudson river, at a point opposite our chief commercial city, New York. In its course it passes near our southern border, and for its supply a reservoir is needed, which requires the basin of Long pond, a portion of which is within our state, and the employment of which, by raising the water, appropriates some lands around its shore.

"If the canal itself came within our limits, it would not be doubtful, according to the views I have expressed, that the legislature could authorize its construction, and the taking of lands for the purpose; and, in that case, the construction of the reservoir for its supply, would be no less within the power.

"It does not follow, because the canal is outside the State limits, that its construction and maintenance are not for a public use, within the meaning of our Constitution. If it were within our limits, what are the public benefits to result from its construction? Not merely that our citizens may use it for transportation or travel. Providing transportation to market and facilitating intercommunication are some of the public purposes of such improvements; but communication between our chief cities and the productive regions which lie outside our State, and intercourse with those

who dwell there, are as truly objects of public interest and advantage as between two sections of the State itself. Besides, the court cannot say that the Morris canal does not run within the reach of a portion of our own citizens, and directly aid them in the conduct of their intercourse with our eastern border, or the counties along the Hudson river to which it runs.

"The work promoted belongs to a class long recognized as public in its character; and I think it was for the legislature to say whether the benefit to result to our own citizens, and facilitating internal commerce for the promotion of our trade or otherwise, were sufficient to call for the exercise of the power to take private property therefor; and that the decision of the legislature on that point is not subject to review in this court."

It seems to us that all that was said in that decision can be as truthfully said, by appropriate paraphrasing, with regard to the mutual relationship and interests of this state and the state of Oregon in what is here proposed to be done, especially in view of the reciprocal rights granted to the cities of each state in the other state by these laws passed manifestly as reciprocal measures. In *Reddall v. Bryan,* 14 Md. 444, we also have a case which involved an express legislative grant by the legislature of Maryland to the government of the United States to exercise the right of eminent domain of the state of Maryland in the courts of that state in the acquisition of property rights within that state necessary to the furnishing of the city of Washington with water. The constitution of Maryland, like our own, permits the exercise of the state's rights of eminent domain only in taking or damaging property for the public use, and answering the argument that the taking of the property in that state for the purpose of furnishing the city of Washington with water was not taking it for a public use of the people of that state, and therefore not a public use within the mean-

ing of the state constitution, Justice Bartol, speaking for the court, referring to the "public use" mentioned in the state constitution, said:

"We regard the words of this section as mandatory, both as to the *use* for which private property may be taken, and the previous payment or tender of compensation therefor. It can be taken only for *public use*. But we cannot adopt the narrow and restricted construction of these words contended for by the appellant's counsel. They do not mean merely a use of the government of Maryland, and the State of Maryland, and its inhabitants as such, but in our opinion, they embrace within their scope, a use of the government of the United States.

"The supplying of the capital of the United States with water, essential for the preservation of the public buildings and public records, and alike essential for the use of the officers of the government, who are compelled to reside there, permanently or temporarily, is surely a *public use,* within the meaning of our state Constitution.

"Maryland, as one of the States of the Union, and, in some sense, an integral part of the great public, interested in and constituting a part of the general government, has, by the provision of her Constitution, which we have cited, conferred upon the Legislature the power of passing the Act of 1853, and we should have no difficulty in pronouncing that Act valid and constitutional, even if there were no other or different relations subsisting between the State of Maryland and the seat of government of the United States, than those which belong to every other State. But, as justly remarked by the judge of the Circuit Court, in his opinion in the case of *United States vs. Anderson,* 'By the act of 1791, in pursuance of the 8th Sec. of the 1st Article of the Constitution of the United States, the state ceded jurisdiction over its portion of the ten miles square, for certain purposes. . . . The state never intended to abandon all interest in the District.'

"The relation, therefore, between the District of Columbia, composed of territory ceded by Maryland

for certain purposes only, and the state of whose soil it forms a part, is more intimate and close than that which it bears to any other state.

"We conclude, therefore, that the expropriation of lands in Maryland, for the purpose of supplying the city of Washington with water, may be regarded, in every sense, as *taking it for public use.*

"We are also of the opinion that the government of the United States possesses the power, under the Constitution, to construct such aqueduct, drawing its supply of water, if necessary, from within the limits of Maryland, and using and occupying lands for that purpose in Maryland, by the permission and consent of the State."

It is true that the learned writer of that opinion does observe some distinction between the relationship existing between the state of Maryland and the District of Columbia, and that which exists between one state and another; but his language in the opinion is convincing that the decision would have been the same had they regarded the relationship between the District of Columbia and Maryland the same as that existing between two states. As already noticed, we have not overlooked the provisions of Const., art. I, § 16, which in express terms makes the question of public use a judicial one in this state, to be "determined as such without regard to legislative assertion that the use is public," and we are assuming, for argument's sake, that the Oregon constitution is the same; but it seems·to us that this is not so much a question of public use; for manifestly the taking of property rights by the city of Walla Walla, as contemplated, would be taking them for a public use, speaking generally; but it is more a question of whether or not such public use is one for which the legislature of the state may, *by express enactment,* authorize property to be taken by the exercise of the state's power of eminent

domain. This phase of the question, we think, partakes of a legislative as well as of a judicial nature, as it seems to have been regarded by the New York and Maryland courts in the decisions above quoted from. This is not a question of taking from the state of Oregon any of its sovereign powers or rights; but is only a question of that state voluntarily exercising, or rather permitting the exercising of, its sovereign power of eminent domain to further the public interest of her sister state of Washington, in return for which her people not only receive at least some use of a public nature not materially different from that use received by the states of New York and Maryland in the cases above noticed, but also in return for which her own cities are accorded like property privileges in the state of Washington. We are quite convinced that we would not hold our law granting this privilege to the cities of Oregon unconstitutional, were the question presented to us by a reversal of the situation here involved; and shall therefore presume that the Oregon courts will not hold the law of that state here in question as violative of its constitution, but will give the law full force and effect in aid of the improvements proposed to be made by the city of Walla Walla.

The suggestion that the city of Walla Walla might be impeded because it in no event can exercise the right of eminent domain within the limits of the Wenaha National Forest Reserve, seems to be answered by the fact that the city has already acquired all necessary rights within the limits of that reservation. If not, it seems plain that it will be enabled to do so under the Act of Congress of February 1, 1905, which makes express provision for the acquiring of such rights by the city. 33 U. S. Stat. at L., part 1, p. 628.

It is contended by counsel for appellants that the trial court erred in refusing to enjoin the city authorities from disposing of the bonds at a price below par. The allegations of the complaint as to this threat are that the city authorities are threatening to sell "a part only of said bonds at par, and a part thereof at ninety-five cents on the dollar." This is all the information that the record furnishes us as to just what the threat of the city officials is in this regard. It is not claimed, and we shall therefore not assume, that such a sale of a part of the bonds, resulting in the total amount of the discount upon the bonds so sold, added to the total amount of the interest at the rate specified therein, will exceed the amount of interest upon the bonds so sold computed at the maximum rate allowed by the statute upon such bonds; or will exceed the amount of interest upon the bonds so sold computed at the maximum rate specified in the ordinance submitting the proposition to the voters of the city. This contention is rested upon a literal reading of the following provision of the ordinance submitting the proposition to the voters: "None of said bonds shall be sold or issued in payment of the cost of said improvements at less than par value and accrued interest." Should we look no further, this would seem to call for the conclusion that appellants' counsel here contend for, assuming, for argument's sake, that the question is one that is contemplated by the statute shall be submitted to the voters, and their decision become binding upon the city's authorities. But the ordinance also provides that the sale of the bonds "shall be made in such manner as the city commission shall deem for the best interest of the city," which is, in substance, the same as is provided in § 8007, Rem. Code, relating to the issuance and disposition of such

bonds. Reading these provisions together, in view of the fact that we must proceed upon the presumption that the city authorities are not contemplating selling any of the bonds at such a discount below par that the total amount of such discount and interest, computed at the rate therein specified, will result in the city, in effect, paying interest in an amount greater than the maximum rate allowed by the statute and ordinance, we feel constrained to hold that there are not here alleged or shown any facts warranting the court in interfering upon the ground that the city is disposing of the bonds at less than their par value. Observations made in our recent decision in *Hill v. Seattle,* 108 Wash. 572, 185 Pac. 631, we think, support this conclusion.

It is contended that the election was of no legal effect as a final authorization by the voters of the city for the making of the proposed improvements or the issuance of the bonds, because the election amounted only to the ratification of the ordinance (No. A 435, City of Walla Walla) submitting the proposition, rather than a final ratification of the proposition submitted by the ordinance. The notice of election, as well as the ordinance, in terms, submitted to the voters for their final ratification or rejection the proposition of making the improvements and issuing the bonds. Section 9 of the ordinance provides that,

"If the voters of said city voting at said election shall ratify said proposition and shall ratify this ordinance, by a three-fifths vote as provided by law, then and thereupon the propositions and plans to make additions, and betterments to and extensions of said water works system and to pay the cost thereof by the issue and sale of bonds as in this ordinance provided shall be carried out by the city commission, . . ."

And the prescribed form of the ballot, after submitting the proposition to the voters, concludes with these words: "and shall said ordinance be ratified," so the voters do seem to have expressed themselves in form upon the question of the ratification of the ordinance; but the fact remains that they also express their decision upon the question of the adoption of the proposition. The ordinance concludes with the declaration that it shall take effect immediately. It seems plain to us that the intent expressed in the ordinance and the ballot, when their provisions are considered together, is that the ordinance shall be deemed in full force and effect, in so far as it provides for the submission to the voters of the proposition of making the improvements and the issuance of the bonds, and that the voters could not have understood otherwise. We are of the opinion, therefore, that the election did not fail, in its legal effect, as an authorization for the city authorities to proceed with the improvements and the issuance of the bonds. Our decision in *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998, dealing with a somewhat similar situation, we think, supports this conclusion.

It is contended in appellants' behalf that the election became of no legal effect as a ratification of the proposition, because the notice of election was first published less than thirty days following the passage of the ordinance. This contention is rested upon the theory that the ordinance could not legally go into effect before thirty days following its passage, because of the provision of § 7670-22, Rem. Code, relating to ordinances passed by a commission of a city having the commission form of government, reading as follows:

"No ordinance passed by the commission, except when otherwise required by the general laws of the

state of Washington or by the provisions of this act, except an ordinance for the immediate preservation of the public peace, health or safety, which contains a statement of its urgency and is passed by unanimous vote of the commission, shall go into effect before thirty days from the time of its final passage, . . ."

This language is followed by provisions enabling the voters of the city to invoke a referendum upon ordinances passed by the city commission during a period of thirty days following their passage. This ordinance concludes with a declaration of emergency, and that it "shall take effect and be in force immediately upon its passage and publication." It is argued that the ordinance is by its nature such that it cannot be emergent, and therefore not capable of being put into effect immediately as such, and thus take away from the voters the right of referendum thereon. It seems to us that this ordinance, in so far as it submits the proposition of making the improvements and the issuance of the bonds to pay therefor, is, in no event, subject to a referendum, because, by its very terms in that regard, and by the express provision of the statute under which it was passed, it is within itself a providing for a referendum. In view of this fact, together with the fact that the ordinance was passed in the exercise of the power conferred upon the city authorities by the law relating especially to cities acquiring public utilities, rather than in the exercise of general powers given by the general organic law of cities having a commission form of government, we are of the opinion that there was no legal impediment to the ordinance going into effect immediately upon its passage and publication, in so far as the submission of the proposition to the voters is concerned; that it did go into effect immediately upon its passage and publication; that it was not subject to referendum, so far as that purpose is con-

cerned; and that, therefore, the publication of the election notice was not premature, but was as valid and effectual as if made after the expiration of thirty days following the passage of the ordinance.

Some contention is made in appellants' behalf that the proposition was not properly submitted to the voters, because "no sufficient plan or system is set forth therein as required by law." The only requirement of the statute in this regard, § 8006, Rem. Code, is that the "corporate authorities shall provide therefor by ordinance which shall specify and adopt the system or plan proposed, and declare the estimated cost thereof as near as may be." We think it is contemplated by the statute that the system and plan proposed need be specified only in such general terms as will fairly inform the voters of the general nature and extent of the proposed improvements, and that this ordinance sufficiently does so by the specification of the system and plan as summarized near the beginning of this opinion. Our decisions in *Seymour v. Tacoma,* 6 Wash. 138, 132 Pac. 1077, and *Paine v. Port of Seattle,* 70 Wash. 294, 126 Pac. 628, 127 Pac. 580, support this conclusion.

It is contended in appellants' behalf that two or more separate propositions were submitted as one, so that the voters had no opportunity to vote separately thereon, and that therefore the election was of no legal effect. The argument is that the proposed construction of the reservoir is a proposition so independent of the other proposed extensions that there was, in legal effect, at least two separate propositions submitted to the voters. We cannot agree with this view of the submission of the proposition, since all of the things proposed to be done have to do with additions, betterments and extensions to the city's water works

system as a whole. In *Blaine v. Hamilton,* 64 Wash. 353, 116 Pac. 1076, 35 L. R. A. (N. S.) 577, where there was involved the submission to the voters of several propositions looking to the construction of the Lake Washington canal, and the erection of wharves and docks in the furtherance of that improvement, Judge Gose, speaking for the court, in holding that all was, in legal effect, one proposition for the purpose of submitting the same to the voters, said:

"Counsel for the appellants, in his oral argument, stated that the true test of whether a proposition is single is, will it stand alone. This, we think, is but one of the tests of singleness, and might often be no test at all. The true criterion is, are the several parts of the project so related that united they form in fact but one rounded whole. Either of two converging highways, or either of two public highways terminating upon a highway common to both, would stand alone, but there are few cases which would hold that bonds were invalid where the two were submitted as a single project. Again, we have no doubt that a proposition could be submitted as a unit for bonding the city of Seattle for the construction of one school house on Capitol Hill and another on Queen Anne; or for the construction of isolation hospitals at points remote from each other, if the law permitted bonds for that purpose."

Our later decisions in *Tulloch v. Seattle,* 69 Wash. 178, 124 Pac. 481; *Aylmore v. Hamilton,* 74 Wash. 433, 133 Pac. 1027, and *Chandler v. Seattle,* 80 Wash. 154, 141 Pac. 331, are to the same effect, and we think leave little room for arguing that the submission to the voters of the proposition here in question was, in legal effect, other than the submission of a single proposition to them.

Contention is made in appellants' behalf that the issuance of the bonds in the sum of $500,000, as proposed, will increase the city's debt beyond the amount

allowed by the state constitution and the statutes under which it is sought to incur such indebtedness. In Const., art. VIII, § 6, it is provided:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, except that in incorporated cities the assessment shall be taken from the last assessment for city purposes: Provided, that no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes: Provided further, that any city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional for supplying such city or town with water, artificial light, and sewers, when the works for supplying such water, light, and sewers shall be owned and controlled by the municipality."

This proposed indebtedness is sought to be incurred under § 8007, Rem. Code, which authorizes the incurring of indebtedness of this nature within the limits in substance the same as in the above quoted provision of the constitution. The assessed valuation of the taxable property within the city is $9,982,955. The total debt limit of the city might therefore be $998,295. The city's present indebtedness amounts to only $390,457. Thus it at once becomes apparent that, when this proposed indebtedness of $500,000 is added to the total present debt of the city, its total debt will be within its

debt limit of $998,295. But it is contended, though very briefly argued, that this proposed $500,000 indebtedness is limited by the final five per cent limitation of indebtedness allowed for supplying the city "with water, artificial light and sewers," viewed apart from the other five per cent debt limit; and also that such five per cent debt-incurring power cannot be exhausted for supplying the city with water alone. Both of these arguments, it seems to us, have been answered in the early decision of this court in *Metcalfe v. Seattle,* 1 Wash. 297, 29 Pac. 1010, wherein Judge Stiles, speaking for the court, said:

"We regard the language of the constitutional provision as reading in the disjunctive, as though it were 'water, artificial light *or* sewers.' . . .

"The three-fifths majority having been obtained, there is no further obstacle to the issuance of such bonds, although they amount to more than five per cent of the taxable property of the city, providing that with their issuance the total indebtedness of the city is not increased to more than ten per cent of such property."

We fail to see, as at present advised by this record and counsel's presentation of this question, wherein the constitutional or statutory debt limit of the city will be exceeded by incurring this $500,000 indebtedness.

Two or three other grounds for interference by the court with the proposed action of the city authorities looking to the making of the improvements and the issuance of the bonds are briefly suggested, but we deem it sufficient to say that we regard them as without merit, in so far as the relief sought, or which should be granted in this action, is concerned.

The judgment is affirmed.

HOLCOMB, C. J., TOLMAN, FULLERTON, and MOUNT, JJ., concur.

MAIN, J. (dissenting)—In this case I am unable to agree with the conclusions reached in the majority opinion upon two points. The first is the holding that, under the statutes of this state, Remington's Code, §§ 7612 and 8005, which authorize cities to condemn property "within or without the corporate limits" thereof, cities have the power to condemn land not only in this state, but in the state of Oregon, providing that state shall have given its consent. When the legislature provided that cities of this state might acquire property by condemnation or purchase within or without, the corporate limits thereof for the purpose of providing a water supply, it was certainly not within the contemplation of that body that the power would be exercised in a foreign state. It goes without saying, of course, that the legislature of this state had no power to authorize the taking of property in the state of Oregon without the consent of that state. This question, however, is of minor importance, because, if the language of the statute is not broad enough, the legislature at its approaching session could, and probably would, grant the power in more comprehensive terms.

The other question upon which I am constrained to disagree with the majority is the holding that property in one state may be taken for a public use in another state. While the present case is an attempt on the part of a city of this state to condemn land in the state of Oregon for water works purposes, the question is treated in the majority opinion as though it were an Oregon city seeking to do in this state what Walla Walla is seeking to do in Oregon. I will therefore treat the question in the same manner. Under Const., art. 1, § 16, private property may be taken for a public use, and whenever an attempt is made to take prop-

erty for such purpose, "the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public." Under this provision of the constitution, it becomes the duty of the court to determine whether public use as there used means public use for the benefit of the people of this state, or whether it has a broader meaning and includes a public use for the benefit of the people of an adjoining state. In *Grover Irrigation etc. Co. v. Lovella Ditch etc. Co.*, 21 Wyo. 204, 131 Pac. 43, the supreme court of Wyoming, as I read the opinion, had this precise question before it and determined it, holding that public use meant public use for the benefit of the people of the state from which the power is derived. In that case an irrigation company in the state of Colorado sought to condemn land across the border in the state of Wyoming. The public use for which the property would be acquired was for the benefit of the people of Colorado. Two points were urged there against the right to condemn: "First, that land in this state cannot be taken by condemnation where the only proposed use in this state is the irrigation of lands in another state." The second question it is not necessary here to refer to. In deciding the first question it was said:

"It will not be necessary to consider the second proposition or either of its divisions suggested by the argument, for in the view we take of the case the fact that all the water to be diverted by means of the headgate and ditch is to be used exclusively for the irrigation of land in another state is sufficient to cause a reversal of the judgment."

The trial court had sustained the claimed right to condemn. Before the opinion concluded, it was suggested that it probably would be difficult to find author-

ity in the statutes to condemn land for the benefit of the business of a foreign corporation conducted exclusively in another state, but this question was not decided because the "petitioner has shown no right under the constitution or statute of this state to condemn the land in controversy." In *Washington Water Power Co. v. Waters,* 19 Ida. 595, the plaintiff, a Washington corporation engaged in the business of supplying light and power in the state of Washington and also in the state of Idaho, sought to condemn land in the latter state for the purpose of enlarging its plant. The right to condemn was there sustained upon the sole ground that the condemning company was serving people of the state of Idaho and that the purpose to which the property would be devoted was a public use within that state. The fact that the same company was serving the people of another state also, would not deprive it of the right to condemn. In the course of the opinion it was said:

"Condemnation could evidently not be had in this state for the purpose alone of serving a public use in another state, but where the use for which the condemnation is sought is a public use in this state, and will serve the citizens of this state—their demands, necessities and industries—the fact that it may incidentally also benefit the citizens and industries of a neighboring state will not defeat the right of condemnation.

"It would be difficult, and indeed unreasonable, to say that the energy generated by the water power of this state should only be used in operating cars to and from the state line, and that in order to propel them thence to Spokane and back to the state line the company must secure its power in some other way and from some other source. . . . This demonstrates the correctness of the proposition above stated that the test must be—is the use a public use within this state, and does it serve the interests·of the people of

this state? If it does so, the fact that it incidentally or in connection therewith likewise serves the interests of a neighboring state, and the people of such state, will not render it any the less a public use, or the service any the less a public service, subject to the regulation and control of the state."

While the right of condemnation there was sustained, it was upon the sole ground that the property taken would, in part at least, be devoted to a public use in that state. The court recognized that, if the property was being taken solely for the public use in another state, the right of condemnation would not exist.

The writer of the article on Eminent Domain in 10 R. C. L., at page 20, expresses the opinion that property in one state cannot be taken under the power of eminent domain for a public use in another state. In Lewis on Eminent Domain, § 310, upon the same question, it is said:

"The public use for which property may be taken is a public use within the state from which the power is derived."

In Nichols on Eminent Domain (2d ed.), vol. 1, p. 97, the author states the law to be as follows:

"One state cannot take or authorize the taking of property situated within its limits for the use of another state. Any employment of the power of eminent domain for other purposes than to enable the government of the state to exercise and give effect to its proper authority, effectuate the purpose of its creation and carry out the policy of its laws could not be rested upon the justification and basis which underlie the power, and has never received the sanction of the courts. Accordingly, it would seem that if a municipality was located close to the boundary of another state, and the only available property for satisfying the necessity and convenience of its people for such

purposes as a water supply, a sewer outlet, or a park was situated across the boundary line, it would be impossible to take the necessary land by eminent domain even with the consent of the state in which it was situated, for the legislature of neither state would have power to grant the requisite authority—in one case because the property sought to be taken was not within its jurisdiction, and in the other because the use for which it was sought to take the property was not one for which it lay within its power to invoke the exercise of eminent domain. . . ."

Two cases are referred to in the majority opinion as supporting the conclusion there reached, but I did not so read them. In the New York case of *In re Townsend,* 39 N. Y. (App. Div.) 171, the right to take property in that state by the New Jersey Canal Company was sustained because the canal was a public benefit and of public use to the people of the state of New York. It was there said:

"It does not follow, because the canal is outside the state limits, that its construction and maintenance are not for a public use, within the meaning of our constitution. If it were within our limits, what are the public benefits to result from its construction? Not merely that our citizens may use it for transportation or travel. Providing transportation to market and facilitating intercommunication are some of the public purposes of such improvements; but communication between our chief cities and the productive regions which lie outside our state, and intercourse with those who dwell there, are as truly objects of public interest and advantage as between two sections of the state itself. Besides, the court cannot say that the Morris canal does not run within the reach of a portion of our own citizens, and directly aid them in the conduct of their intercourse with our eastern border, or the counties along the Hudson river to which it runs."

The doctrine there applied is similar to the doctrine which permits a railway company to condemn land.

The other case is that of *Reddall v. Bryan*, 14 Md. 444. There the court had before it a statute which granted to the Federal government the right to exercise the power of eminent domain in the courts of that state for the purpose of acquiring property necessary to the furnishing of the city of Washington with water. This case is not in point, for two reasons, first, the relation between the Federal government and the state is very different from the relation which exists between two states; and second, even without the act of the legislature of the state, the Federal government had the power to acquire by condemnation such property as was necessary to the exercise of the powers conferred upon it by the constitution. *Kohl v. U. S.*, 91 U. S. 367. This right is sustained upon the ground that property acquired for the purpose of the national government, being for the use of the people of all the states, is as well for the use of the people of that state where it is located. Lewis on Eminent Domain (3d ed.), vol. 1, § 309; Cooley's Constitutional Limitations, 655, and *Grover Irrigation etc. Co. v. Lovella Ditch etc. Co., supra.* So far as I am informed, there is no authority for the holding of the majority opinion that property may be taken in this state for a public use in the state of Oregon when it is disassociated with any public use or benefit to the people of this state. Not only is such a holding not supported by authority, but reason is against such a conclusion. When it was provided in the constitution that private property in this state might be taken for a public use, and that whether a contemplated use should be really public should be a judicial question, it was undoubtedly and plainly contemplated that that public use was a public use for the benefit of the people of this state, and that it was not contemplated by the framers of the

constitution that the language there used should be stretched to include the public use in a neighboring state in no way connected with the public use in this state. If the term public use is to be given this broad meaning, then the public service company in Oregon, or any other adjoining state, may come into this state and acquire property by condemnation for a public use in another state which does not in any way serve the people of this state. It seems to me that the language of the constitution should be adhered to and that its meaning should not be thus broadened.

For the reasons stated, I am unable to concur in the majority rule on the two points mentioned, and I therefore respectfully dissent.

MITCHELL and MACKINTOSH, JJ., concur with MAIN, J.

BRIDGES, J. (dissenting)—I concur in the foregoing dissenting opinion concerning the power to take private property in one state for a public use in another state, which, indeed, is the chief ground of dissent.