SCROGGINS *v.* KERR.

4-9196                                    228 S. W. 2d 995

Opinion delivered April 17, 1950.

*J. Fred Jones, Terrell Marshall, Thad Tisdale,* and *George W. Shepherd,* for appellant.

*T. J. Gentry,* for appellee.

LEFLAR, J. The question here is whether Ordinance 8163 of the City of Little Rock may by referendum petition filed under the Arkansas Constitution, Amendment VII, be submitted to vote of the people at a special election. Ordinance 8163 authorizes execution of a "cooperation agreement" between the City and the federal Public Housing Administration (hereinafter called P.H.A.) for the construction of certain low-rent housing projects in Little Rock. After referendum petitions were filed, the City Council concluded on advice of counsel that the Constitution did not authorize a referendum on this ordinance, and declined to call an election. The petitioners then brought mandamus to require the calling of an election, the Chancellor denied the writ of mandamus, and this appeal follows.

The "United States Housing Act of 1937," [1] with its amendments, [2] authorizes federal cooperation with states and local governments in the development of "decent, safe and sanitary dwellings for families of low income, in rural or urban communities" and in the corresponding elimination of "unsafe and insanitary housing conditions . . . that are injurious to the health, safety and morals of the citizens of the nation." Arkansas by Act 298 of 1937, the "Housing Authorities Act," [3] created local Housing Authorities in the state and authorized local governmental units to enter into "cooperation agreements" as contemplated by the federal law. Act 298 of 1937 has been sustained and interpreted by this Court in *Hogue* v. *The Housing Authority of North Little Rock*, 201 Ark. 263, 144 S. W. 2d 49, and subsequent cases.

By Resolution No. 1532 adopted on Oct. 5, 1940, the City of Little Rock recognized the need for a Housing Authority to exist and function within the City, and thus

---

[1] Act Sept. 1, 1937, c. 896, §§ 1-30, 50 Stat. 888-899, 42 U. S. Code Ann., §§ 1401-1430.

[2] The amendments and additions to the original Act, including the Act of July 15, 1949, appear in 42 U. S. Code Ann. (1949 Supp.), §§ 1401-1483.

[3] This act, as amended by Acts 352 of 1941, 77 of 1943, and 280 of 1943, appears in Ark. Stats., §§ 19-3001 to 19-3034. Closely related legislation enacted later appears in §§ 19-3035 to 19-3074 and in Ark. Stats. (1949 Supp.), §§ 19-3041 and 19-3042.

gave to the Housing Authority of the City of Little Rock the standing which thereafter enabled it to do business as a going concern. This resolution was not by itself, however, enough to enable the newly created Authority to proceed at once to build or tear down houses; the later execution of "cooperation agreements" for a particular project or projects was pre-requisite to that affirmative activity.

Such a "cooperation agreement" was authorized by Little Rock Ordinance 6010 adopted on Oct. 14, 1940. This ordinance authorized the Mayor to enter into an agreement or agreements with the local Authority for the erection and operation of an unspecified number of low-rent dwellings and the elimination of a corresponding number of "unsafe or insanitary dwelling units," but with the express limitation that the number of "unsafe or insanitary dwelling units" to be eliminated should in no event exceed three hundred (300). Agreements were apparently executed and housing projects erected and operated under the authority conferred by Ordinance 6010.

Ordinance 8163, now before us, was adopted on Dec. 19, 1949. It recited the fact that there are more than 1,000 unsafe and insanitary dwelling units in Little Rock, inhabited by low income families of a number greatly in excess of 1,000, and that P.H.A. had authorized a 1,000-unit construction program for Little Rock. It then authorized the Mayor to execute for the City a new "cooperation agreement" with the local Authority, the provisions of which may be summarized as follows:

The Authority shall endeavor to secure a contract with P.H.A. for loans and contributions to develop and administer one or more housing projects.

The City shall not levy or impose any real or personal property taxes or assessments upon such projects but the local Authority will make annual payments of either ten per cent of the aggregate rent charged by the Authority or the amount permitted to be paid by State law, whichever amount is lower, provided upon failure of

the local Authority to pay, no lien can attach against any project or assets of the Authority.

The City shall distribute the payments in the proper proportion among the taxing bodies to which real property taxes would otherwise have been paid.

The City agrees within five years after completion of the project to eliminate unsuitable dwelling units in the locality substantially equal to the number of ·new units, with certain exceptions.

During the period while any contract for loans or contributions is in force between the local Authority and P.H.A. or any bonds remain outstanding, the City without cost or charge to the local Authority shall:

A.   Furnish the Authority all public services and facilities now being furnished without cost to other inhabitants of the City including educational, fire, police and health protection and services; maintenance and repair of public streets, roads, alleys, sidewalks, sewers and water systems, street lighting, sewer services and such additional services as may hereafter be furnished without cost to other inhabitants.

B.   Vacate such streets, roads and alleys within the area of the Project as may be necessary in the development thereof, and convey without charge to the local Authority such interest as the City may have in such vacated areas; and, insofar as it is lawfully able to do so without cost or expense to the local Authority or to the City, remove from such vacated areas, insofar as it may be necessary, all public or private utility lines and equipment;

C.   Insofar as the City may lawfully do so, grant such waivers of the building code of the City as are reasonable and necessary to promote economy and efficiency in the development and administration of the Project; and make such changes in any zoning of the site and surrounding territory as are reasonable and necessary for the development and protection thereof;

D. Accept grants of easements necessary for the development of the Project; and

E. Cooperate with the local Authority by such other lawful action or ways as the City and local Authority may find necessary in connection with the development and administration of the Project.

The City agrees to furnish garbage and trash removal services at a rate to be later determined but no greater than that charged other inhabitants or existing housing projects and to furnish sewerage services at a rate to be fixed at a later date but not greater than that made to other inhabitants or to existing housing projects nor more than charged public charitable organizations.

The City will accept dedication of all interior streets, roads, alleys and sidewalks within the area of the projects after the Authority has completed them, and will accept dedication of land for and will grade, improve, pave and provide sidewalks on all streets bounding the projects or necessary to provide access thereto and to provide water mains and storm and sanitary sewer mains leading to the projects and serving the bounding streets with the local Authority paying the City such amount as would be assessed against the project if it were privately owned.

If the City fails to furnish the services and facilities as agreed, the local Authority may obtain them elsewhere and deduct the cost thereof from any payment in lieu of taxes due the City.

No Cooperation Agreement heretofore entered into between the City and the local Authority shall be construed to apply to any Project covered by this Agreement.

The contract proposed and authorized shall not be changed and shall be binding upon the City so long as any contract between the local Authority and the P.H.A. for loans or contributions is outstanding or any bonds are outstanding and so long as the beneficial title to the project is held by the Authority or some other public agency including the P.H.A.

The final section declares an emergency making the ordinance in force and effective after its passage and approval.

---

Amendment VII to the Constitution of Arkansas reserves the power of referendum to the local voters of each municipality, as to all "municipal legislation of every character." It further provides:

"Every extension, enlargement, grant, or conveyance of a franchise or any rights, property, easement, lease, or occupation of or in any road, street, alley or any part thereof in real property or interest in real property owned by municipalities, exceeding in value three hundred dollars, whether the same be by statute, ordinance, resolution, or otherwise, shall be subject to referendum and shall not be subject to emergency legislation.

"*Definition*—The word 'measure' as used herein includes any bill, law, resolution, ordinance, charter, constitutional amendment or legislative proposal or enactment of any character."

The Amendment then sets out the procedure to be followed in voting on "measures" which are covered by it.

---

Not all ordinances enacted by city councils come under the head of "municipal legislation." City governments in Arkansas know no such complete separation of powers as would automatically classify all aldermanic activities as legislative in character.

It is well settled that in some of their functionings city councils in this state act *quasi*-judicially. *Williams* v. *Dent,* 207 Ark. 440, 181 S. W. 2d 29; *Martin* v. *Cogbill, Comr.,* 214 Ark. 818, 218 S. W. 2d 94. Our statute (Ark. Stats., § 22-302) authorizing circuit courts on *certiorari* to review proceedings of city councils has been many times employed, though the courts are deemed to have

appellate power only over such acts of inferior bodies as are judicial in nature.[4] Obviously, Amendment VII reserves to the voters no power of referendum over the judicial or *quasi*-judicial acts of city councils.

Similarly, city councils often enact resolutions and ordinances that are administrative or executive in character. This fact is recognized in *Chastain* v. *City of Little Rock,* 208 Ark. 142, 185 S. W. 2d 95. Counsel for appellants here do not deny that aldermanic action is frequently administrative, nor do they contend that administrative action is subject to referendum. Rather, the contention is that Ordinance 8163 is legislative in nature, and not administrative. Appellees' position, contrariwise, is that the ordinance is administrative in nature, and not legislative.

"Both legislative and executive powers are possessed by municipal corporations. . . . The crucial test for determining what is legislative and what is administrative is whether the ordinance is one making a new law, or one executing a law already in existence. . . . Executive powers are often vested in the council or legislative body and exercised by motion, resolution or ordinance. Executive action evidenced by ordinance or resolution is not subject to the power of the referendum, which is restricted to legislative action as distinguished from mere administrative action. The form or name does not change the essential nature of the real step taken. The referendum . . . is designed to be directed against 'supposed evils of legislation alone'. 'To allow it to be invoked to annul or delay executive conduct would destroy the efficiency necessary to the successful administration of the business affairs of a city.' " 1 McQuillin, Municipal Corporations (2d Ed., Rev., 1940) 1000.

The question of whether particular official acts, including city ordinances, constitute "legislative action" is one that has arisen many times and in many contexts. One of the commonest forms of the question is as to

[4] This problem is examined in a Note on "The Extent to Which the Writ of *Certiorari* Lies to Review the Ordinances of Municipal Councils in Arkansas," in (1940) 8 Univ. of Ark. Law School Bull. 28.

whether the rule or enactment attacked was promulgated in violation of the constitutional prohibition against delegation of legislative power. Legislative bodies may delegate the power to make administrative rules, but under most circumstances may not delegate the right to enact legislation. *Kleiber* v. *San Francisco,* 18 Calif. 2d 718, 117 Pac. 2d 657; 1 Cooley, Constitutional Limitations (8th Ed.) 224; Rottschaefer, Constitutional Law, 72. But the sense in which the word "legislation" is used in this connection is not always the same as that in which it is used in other contexts. Conduct allowed as "legislative" in character for one purpose may be deemed "not legislative" for some other and different purpose. The only safe approach to this problem of interpretation is one which takes the term solely in its specific context, and seeks the sense given it in the particular section or sentence of which it is a part. Interpretations elsewhere of identical or similar clauses in the same context will be useful by analogy; interpretations even of identical clauses in a different context will have little value. The context relevant here is the municipal referendum provision in a state constitution.

That the problem of interpretation is an intensely practical one is indicated by our own decision in *Chastain* v. *City of Little Rock,* 208 Ark. 142, 185 S. W. 2d 95. There it was held that an ordinance calling a municipal election on the question whether certain territory should be annexed to the city was not "municipal legislation" within the meaning of Amendment VII, and that a referendum could not be called on it. A referendum would have involved holding an election to determine whether an election should be held, and we said that one election on the principal issue presented by the ordinance was enough. The framers of Amendment VII had one clear purpose, to insure to citizens the democratic right to rule by majority vote on legislative issues, and that right was assured by the form of the ordinance without any necessity for a referendum. Other states have given their referendum laws the same interpretation. *Langdon* v. *City of Walla Walla,* 112 Wash. 446, 193 Pac. 1; *Campbell* v. *City of Eugene,* 116 Ore. 264, 240 Pac. 418.

Similarly, if there is a law already enacted which authorizes the very action provided for by a later resolution or ordinance, then there is no right to have a referendum on the new measure. It is not a new law, but only a procedural device for administering an old law. The right of referendum should have been exercised when the original measure, the enactment that put the law on the books, was newly adopted. Thus, in *Burdick* v. *City of San Diego,* 29 Cal. App. 2d 565, 84 Pac. 2d 1064, there had been a series of San Diego city ordinances authorizing the construction of a new police station. These successive ordinances designated the site for the new building, accepted the site, authorized the city manager to erect and maintain the building, appropriated money to pay the costs, approved the plans and specifications for the building, created a special fund through which the appropriation was to pass, directed publication of an advertisement for bids, and accepted a federal grant in aid of construction. Finally, a separate ordinance was enacted which in effect gave the ''go signal'' on the construction job. A referendum was attempted against this last ordinance, but was held not permissible. The California court said that the prior ordinances were legislative in character, and subject to referendum. After they became law without referendum, however, the legislative phase of the project was ended. The final ordinance was nothing more than an administrative enactment, carrying out the previously enacted laws. And in *State ex rel. Hall* v. *Morton,* 128 Kans. 125, 276 Pac. 62, a city ordinance which fixed the route for a new highway through the city was held to be administrative merely, not legislative, therefore not subject to referendum, when it did no more than carry out an already existent law which provided for the construction of the highway. There are many other cases making the same distinction. See *Keigley* v. *Bench,* 97 Utah 69, 89 Pac. 2d 480, 122 A. L. R. 756; *Seaton* v. *Lackey,* 298 Ky. 188, 182 S. W. 2d 336; *Hawkins* v. *City of Birmingham,* 248 Ala. 692, 29 So. 2d 281.

We cannot agree that Ordinance 8163 was administrative, and not legislative, in this sense. There was

no previous law which authorized what 8163 declared should be done. True, no prior law forbade what 8163 authorized, but that is not the point. The point is that without 8163 there would have been no law in Little Rock authorizing the execution of a cooperative agreement covering the particular construction and demolition, and the numerous incidental rights, privileges and exemptions connected therewith, which 8163 provided for.

The Arkansas Housing Authorities Act (Act 298 of 1937) laid the groundwork for local housing authorities in the cities and authorized the cities, after they recognized the existence of the authorities, to make cooperative agreements with them. Little Rock City Council Resolution No. 1532, of October 5, 1940, did no more than breathe the breath of life into the Little Rock Housing Authority, so that the City could thereafter do business with it. The total effect of these enactments was to make it possible for effective public housing legislation to be enacted in Little Rock; these were preliminary steps only, and the real legislation had yet to be enacted.

Ordinance 6010 was real housing legislation in this sense, since it authorized a cooperative agreement under which actual construction and demolition were to be carried out. But 6010 did not authorize the cooperative agreement that 8163 calls for, nor give any authority for the construction and demolition that would be carried out under 8163. On that, it is enough to remember that 6010 included the express limitation that the number of "unsafe or insanitary dwelling units" to be eliminated under its authority should in no event exceed 300, whereas 8163 authorizes approximately 1,000 such eliminations to correspond with the same number of new dwellings. A careful reading of 8163 shows without question that it provides for new and different housing projects, apart from and in addition to those authorized by 6010. What is to be done under 8163 could not be done under 6010. Ordinance 8163 is a new law, and not a mere procedural device for administering some previous enactment. For a similar holding on similar facts, see *Bachman* v. *Goodwin,* 121 W. Va. 303, 3 S. E. 2d 532.

An alternative basis for our decision here is that part of Amendment VII which declares that "Every extension, enlargement, grant or conveyance of a franchise or any rights, property, easement, lease or occupation of or in any road, street, alley or any part thereof in real property or interest in real property owned by municipalities, exceeding in value three hundred dollars, whether the same be by statute, ordinance, resolution or otherwise, shall be subject to referendum and shall not be subject to emergency legislation". Under the cooperative agreement authorized by Ordinance 8163 the City would, among other things, commit itself to "vacate such streets, roads and alleys within the area of such project as may be necessary in the development thereof, and convey without charge to the local authority such interest as the City may have in such vacated areas". It is difficult to imagine that a project of the magnitude contemplated, if it be erected within the city limits, would not under the quoted clause involve municipal realty having more than the stated value. Our cases dealing with this part of the Amendment include *Southern Cities Distributing Co.* v. *Carter,* 184 Ark. 4, 41 S. W. 2d 1085, 44 S. W. 2d 362; *cert.* denied, 285 U. S. 525, 52 S. Ct. 393, 76 L. Ed. 922; *Smith* v. *Lawson,* 184 Ark. 825, 43 S. W. 2d 544; *Carpenter* v. *City of Paragould,* 198 Ark. 454, 128 S. W. 2d 980. (One of the members of the Court places his agreement with the result here reached upon this alternative ground only.)

It is irrelevant here to inquire into the motives of those who seek a referendum. It may or may not be that their interests are opposed to the public interest. It may or may not be that theirs are selfish concerns, and that urgent public needs might be more quickly served without the delay of a referendum. We do not consider such intimations. The framers of Amendment VII presumably had such matters in mind, and by the terms of the Amendment the decision on such matters was left to the electors of the affected area. The framers recognized the validity of Voltaire's words, "I disapprove of what you say, but I will defend to the death your right

to say it,"[5] and preserved the same protection to the right to vote as to the right to speak. The electors of Little Rock have the right to vote on "municipal legislation" such as Ordinance 8163, and it is for them to pass upon the motives, policies and interests that may be involved.

The decree of the Chancery Court is reversed.

---

[5] Letter from Voltaire written in 1764 to Claude Helvetius concerning book written by Helvetius. Tallentyre, Friends of Voltaire (1906), p. 199.